[Cite as *State v. Lancaster*, 2018-Ohio-315.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2016-CA-39 |
| | : | |
| v. | : | T.C. NO. 15-CR-414 |
| | : | |
| MICHAEL D. LANCASTER, SR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 26th day of January, 2018.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecutor, 61 Greene Street, Xenia, Ohio 45385
      Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 2372 Lakeview Drive, Suite H, Beavercreek, Ohio 45431
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the December 6, 2016 Notice of Appeal of Michael D. Lancaster. Lancaster ("Appellant") appeals from his November 14, 2016 judgment entry of conviction, following a jury trial, on one count of rape, in violation of

R.C. 2907.02(A)(1)(b), a felony of the first degree; one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4), a felony of the third degree; and four counts of illegal use of a minor in nudity-oriented material or performance, in violation of R.C. 2907.323(A)(1), felonies of the second degree. The court sentenced Appellant to life imprisonment without parole for rape, to 36 months for gross sexual imposition, and to seven years for each offense of use of a minor in nudity-oriented material or performance. The court ordered the sentences to be served consecutively for a total sentence of life imprisonment without parole. We hereby affirm the judgment of the trial court.

{¶ 2} Appellant was indicted on July 31, 2015 on the above offenses as well as an additional count of rape that was subsequently dismissed. On September 15, 2015, the State filed "State's Motion to Determine Competency of Child Witness," based upon the age of the victim, who was under 10 years of age. On September 18, 2015, Appellant filed a motion to suppress, seeking suppression of his statements to Greene County Sheriff's department personnel, and the contents of his camera and cell phone.

{¶ 3} A hearing was held on the motion to suppress on December 2, 2015. At the hearing, Patrol Deputy Franklin Hill of the Greene County Sheriff's Office testified that on November 13, 2014, he spoke to W., Appellant's adult son, at the dispatch center regarding "some kind of child sex crime." Hill testified that W. told him that he had taken over a business, "Buck Stove," in Fairborn, from his father, Michael Lancaster. According to Hill, W. advised him that "he had accessed the computers at the business and had found pictures of children in various stages of undress, including nude." Hill testified that W. told him that he then proceeded to the home he shared with Appellant and retrieved a camera and cell phone from Appellant's bedroom. Hill stated that W. told

him that he found "suspicious photos" on the phone, and that he was unable to access the camera because the battery was not charged. Hill stated that he took possession of the phone and camera and booked them into the Property Room.

{¶ 4} Hill stated that Appellant appeared while he was taking W.'s report "and wanted to speak with somebody about the allegations against him." Hill testified that he did not ask Appellant any questions about sexual assault, place him under arrest, handcuff him or tell him that he was not free to leave. Hill stated that Appellant was not brought to the dispatch center by a police officer but that he arrived voluntarily. Hill testified that he informed Appellant "that due to the seriousness of the allegations that I would * * * rather have him wait and, if he was willing, talk to one of our detectives at the Sheriff's Office." According to Hill, Appellant indicated that he was willing to speak to a detective, and Hill walked with him to the sheriff's office. Hill testified that he did not threaten or coerce Appellant, and that he did not promise him leniency for speaking to a detective.

{¶ 5} Deputy Chris Moore of the Greene County Sheriff's Office testified that he is assigned to the Patrol Division. Moore stated that he was employed as a detective on November 13, 2014, and that he was asked to interview Appellant that day, who "at that time * * * wanted to give his version of events." Moore stated that he spoke with Appellant in the interview room, which he described as a 10 feet by 12 feet room with a table and chairs. Moore stated that Appellant was not under arrest at the time, handcuffed, or ordered into the interview room. Moore stated that he did not tell Appellant that he could not leave, and that Appellant entered the room voluntarily. Moore stated that he was not wearing a uniform but was dressed "in probably a business casual,

if not a suit and tie, dress clothes," and that he was wearing his service weapon. Moore testified that he shut the door to the interview room before asking Appellant any questions. He testified as follows:

> And so I showed him the door was unlocked, told him it would only be shut just for privacy and had him walk out and walk into that hallway; and then showed him where that exit door was; showed him where the bathroom door was; showed him where the drinking fountain was; and made sure that he knew he could use that exit in that hallway to leave – anything he wanted.

{¶ 6} Moore testified that he advised Appellant that he was free to leave the interview at any time. Moore stated that he was not aware of any underlying facts regarding the investigation and that he did not consider Appellant to be a suspect. He testified that his conversation with Appellant lasted "ten to twenty minutes." Moore stated that he did not advise Appellant of his *Miranda* rights in the course of the interview. Moore stated that Appellant was never arrested, and that he left the interview on his own. Moore testified that he did not threaten Appellant, intimidate him, or coerce him. He stated that his tone in speaking to Appellant was very casual, and that Appellant "spoke 75, if not 80 percent, of the conversation." Moore stated that Appellant did not appear to be under the influence of alcohol or any sort of narcotic, and that he did not demonstrate an inability to understand any questions.

{¶ 7} Moore stated that at one point in the interview, he left the room "to see what else had been learned at that point." At that time he stated that he spoke to W. on the phone, and that "he was kind of telling what prompted the whole report of him contacting the Sheriff's Office." He testified that his conversation with W. did not change the

dynamic of the interview with Appellant, and that "the dialogue remained the same. It was still information gathering. The only thing that might have changed was I might have asked him a few more specific questions as to the allegations of the photography." Moore stated that in the course of the interview, Appellant did not ask to terminate the interview, ask for an attorney, or indicate that he did not want to talk to him. According to Moore, after Appellant "stated everything that he wanted to tell, he left."

{¶ 8} The following exchange occurred on cross-examination:

Q. Well wouldn't it be an accurate statement to say that upon your return, after looking for similar facts, your interest was piqued with regard to what [Appellant] might have to say?

A. Certainly.

Q. And at that point in time, did you explain to him that he had the right to have an attorney present? That he had the right to not incriminate himself or have him sign any sort of waiver?

A. I did not.

Q. Did you ever, during the course of your interview with him, give him a waiver to sign and fill out?

A. He was never in custody, no.

{¶ 9} On December 14, 2015, Appellant filed a "Post Suppression Closing [Statement] Request for Hearing." On January 26, 2016, the trial court overruled the motion to suppress. The court determined that the interview between Moore and Appellant was not an interrogation, since Appellant "appeared voluntarily at the dispatch center, and a co-worker asked Moore to talk to [Appellant]; at the time of the discussion,

Moore did not view [Appellant] as 'a suspect,' and did not know anything about the allegations against [Appellant]." According to the trial court, other than "Moore's statement that Moore was able to ask more pointed questions after talking with [W.], there is no evidence of questioning by Moore; Moore testified that [Appellant] did 75-80 percent of the talking." The court determined that "Deputy Moore's discussion with Michael Lancaster of Nov. 13, 2014 was not a custodial interrogation, and therefore *Miranda* warnings were not required. Accordingly, the Court denies Defendant's motion to suppress statements and/or videos of Michael Lancaster on the ground that *Miranda* warnings were not given to [Appellant]." Regarding the camera and cell phone, the court determined that "there is no evidence suggesting that [W.] was influenced or directed by law enforcement in any manner when [W.] looked at his father's cell phone and brought the cell phone and camera to the dispatch center. The court finds that [W.] was not acting as an agent or instrument of the State in regard to the cell phone and camera."

{¶ 10} On February 1, 2016, Appellant filed a "Motion to Renew Motion to Suppress and Request for Hearing." On February 4, 2016, the trial court issued a "Judgment Entry Granting Motion to Reopen Motion to Suppress and Continuing Trial Date." A hearing was held on the motion on March 10, 2016. At the start thereof, counsel for the parties agreed that the purpose of the hearing was to determine whether W. acted at the direction of law enforcement when he seized the cell phone and camera. The State called Officer James Hern of the Fairborn Police Department. He stated that on November 13, 2014, while on road patrol, he was called to the Fairborn Police Department Dispatch. He stated that upon arrival, "they informed me that a subject had come in and stated that he had wanted to report a sex offense involving minors." According to Hern,

"[b]y the time I showed up he had already left and was no longer at the Police Department." Hern testified that W. then returned to the lobby and he met with him there. Hern testified that W. told him that Appellant had recently transferred "Buck Stove" to him, and that "he hired a new secretary. The secretary was going through office equipment and located what he believed was child pornography on a couple of the computers." Hern testified that W. told him that he proceeded to his residence, which has a Xenia address, where he retrieved a cell phone containing child pornography. He stated that W. had with him the cell phone, a digital camera, and two computer towers. Hern testified that he took possession of the computers and directed W. to take the camera and phone to the Xenia Police Department, since the Xenia residence "had no ties to the City of Fairborn." On cross-examination, Hern stated that he kept the computers because they were retrieved from a Fairborn business on Dayton-Yellow Springs Road. He stated that W. told him the cell phone and computer belonged to Appellant, and that they resided together.

{¶ 11} W. testified that he went to the Fairborn Police Department on November 13, 2014 after he discovered child pornography on a work computer. He testified that he brought "[s]ome computers, a cell phone, and a camera" to the police department. According to W. he retrieved the computers from "Buck Stove and Fireplace" in Fairborn, and the cell phone from his father's bedroom at their home in Xenia. W. stated that he observed "some scantily nude photos in there" on the phone. W. testified that he "couldn't open up the camera and look at it," and that he determined he "might as well bring the camera as well because I saw that [N.W.], our child, had always been playing with the camera." He stated that he gave the computers to the Fairborn police and was

told to take the camera and cell phone to the Xenia police because Fairborn police lacked jurisdiction over the items.

{¶ 12} Finally, David Hayes testified that he is an assistant prosecutor in Greene County. He stated that he had "an inadvertent contact" with W. on January 19, 2015 in the course of a "scheduled interview with the victim and her mother" at "Michael's House," which is a child advocacy center in Greene County. Hayes stated that he had never met W. before that date. When asked, in his initial meeting with W. if W. indicated to him that he brought items to the police "at the direction of someone in law enforcement," Hayes responded that W. "made statements that caused me enough concern that I thought it needed to be clarified and that's why I brought it to your attention." Hayes stated that in a subsequent conversation with W., "I asked him point blank did somebody with the Fairborn Police Department, or any law enforcement agency, instruct you to seize any phone or any item of property from Michael Lancaster's house and he said, no."

{¶ 13} The trial court overruled the reopened motion to suppress on March 25, 2016. The court concluded that "the State had no involvement in [W.'s] decision to search and seize the cell phone and camera of Michael Lancaster located at their shared residence in Xenia, and that the State had no involvement in [W.'s] decision to turn these items in to law enforcement." According to the trial court, "there is no state action and the Fourth Amendment is not implicated." The court determined that W. was a credible witness.

{¶ 14} On September 22, 2016, the trial court issued an "Entry Amending Count 3 of Indictment." Count 3 of the original indictment provided in part that Appellant "did, have sexual conduct with another * * *." Amended Count 3 provides in part that Appellant

"did cause another not the spouse of the offender to have sexual contact with the offender * * *."

**{¶ 15}** Trial commenced on September 19, 2016. After the State's opening statement, counsel for Appellant deferred his opening statement, and W. then testified. W. stated that Appellant is his adoptive father. W. testified that V.W. is his girlfriend, and that she has a daughter, N.W., who is ten years old. W. stated that Appellant offered him the opportunity to help him in his business in Fairborn, and that he moved to Xenia in 2013 to do so. W. stated that he started working in August 2013 in Fairborn. He stated that he initially lived on Bowman Drive but then he, V.W. and N.W. moved into Appellant's home on Hook Road in October 2013. W. stated that he has prior felony convictions that made it difficult for him to find employment.

**{¶ 16}** W. stated the Fairborn Police took possession of the computers, and that he took the phone and camera to the Xenia Police Department on November 13, 2014. W. stated that he believed that Appellant had downloaded the images on the computer at work. When asked why he thought so, W. responded that he has "walked into the store on numerous occasions and have caught him with his pants down playing with himself in front of the computer; hearing sounds, you know, like sex sounds coming from the computer on numerous occasions."

**{¶ 17}** Deputy Franklin Hill of the Greene County Sheriff's Office testified consistently with his testimony at the initial suppression hearing regarding his receipt of the camera and cell phone from W. He identified the November 13, 2014 property tags for the items that he completed before sealing them in packages and placing them in the property room.

**{¶ 18}** Deputy Chris Moore testified that in the course of his interview with Appellant that Appellant advised him that he was transferring his business to W., and that on the previous night he and W. had argued and Appellant told W. that he was fired. According to Moore, Appellant advised him that the next day he received a call from W. telling him that he had found pornographic images on a computer and his cell phone and that he was going to turn them into the police. Moore stated Appellant told him that his cell phone had been in the bedside table for a year. Moore stated that Appellant acknowledged that there might be pornographic images on the phone and computer of 18- or 19-year old girls.

**{¶ 19}** Moore stated that after he spoke to W. by phone, he asked Appellant again about pornographic images on his cell phone. According to Moore, "[Appellant] started getting a little bit upset. He produced a cell phone out of his pocket and began showing pictures. And he showed pictures that started off with chimneys and fire inserts of jobs he had done and then continued on and there were pictures of a young girl on his phone, but none of them that he showed me were that of pornography." Moore stated that Appellant told him that the young girl was N.W., the daughter of W.'s girlfriend. Moore stated that Appellant told him that W. was out to get him. According to Moore, Appellant "told me that he and his wife, that [Appellant] and his wife, had adopted four children many years ago while living in Fairborn and that he – there was two girls of the four. And those two girls, later in life, accused [Appellant] of molesting them and having intercourse with them." Moore testified that Appellant "believes that [W.] held this and was upset at him for these allegations back then. And felt that he might be trying to get some sort of revenge or something for that by making allegations."

{¶ 20} Kathy Geyer, the manager of the Property Room for the Greene County Sheriff's Office, Detective Kyle Metz of the Greene County Sheriff's Office, and Diamond Boggs, a Computer Forensic Specialist at the Ohio Bureau of Criminal Investigation, provided chain of custody testimony for the cell phone and the camera.

{¶ 21} Jarrod Scott testified that he is a Computer Forensic Specialist at the Ohio Bureau of Criminal Investigation, and the court certified him as an expert with regard to evidence recovery from digital devices. Scott stated that pursuant to a warrant he examined a cell phone and camera belonging to Appellant. He described the process he used to extract data from the devices and analyze it. He testified that he extracted the data on February 3, 2015. Scott stated that he provided a written report to Detective Kyle Metz containing all the data from the cell phone, and that he did not discover anything of evidentiary value on the camera.

{¶ 22} Scott testified that a Google account was associated with the cell phone. He stated that he was asked to issue a second report and isolate graphics pertaining to child victims. Scott testified that he "found graphics of a potential juvenile female and a male penis. They were thumbnail graphics. The – in some of the graphics the juvenile had the penis in her mouth; other graphics the juvenile had the penis in her hand. There were nude, full frontal and rear photographs of a juvenile female; the thumbnail graphics that had dates and times were May 28th, 2014." Scott stated that there "were other graphics of child models and child erotica that were discovered in the Chrome browser cache as they had been viewed on the web - on the Internet. And there were some in the download folder, so they had been downloaded to the phone. The dates and times on those were between May 3rd, 2014 and June 12th, 2014."

{¶ 23} Scott stated that he further "carved graphics from deleted space," and authored a report on his findings. He stated that he also searched for "web histories" on the cell phone. He stated that he found "Google Image searches for child erotica on April 18th, 2014. There were also Google web searches, along with Google image searches, for pre-teen p[***]y on June 22, 2014." Scott stated that there were Google searches "for A-S-S-T-R- on multiple dates between April 2014 and June of 2014," and he testified that the title of that web site stands for "alt sex stories text repository. It's a website that has stories that people can write and unload about anything they want." Scott testified that stories "with names such as: School Girl Rape; Secret Slaves; and Raped Virgin Cheerleader" had been accessed According to Scott, in "the pedophilia category there were stories with the names: Innocence Defiled; Tina, Younger/Older; and Goody Goody Girls, Two Virgins in Boys Locker Room; and then an Incest category with the name: Twelve Year Olds. And the websites were visited again between April 2014 and June 2014."

{¶ 24} Scott then identified the individual graphic images he extracted from the phone as follows: Exhibit 28 "depicts a male penis and a possible juvenile touching the penis"; Exhibit 29 depicts "a male penis and a possible juvenile standing near it"; Exhibit 30 "appears to just contain the male's penis"; Exhibit 31 "appears to be a girl with a notebook or piece of paper"; Exhibit 32 "appears to be a juvenile from the rear * * * possibly showing her buttocks"; Exhibit 33 "appears to be a juvenile performing fellatio on a man's penis"; Exhibit 34 "appears to, again, depict possible juvenile touching a male's penis"; Exhibit 35 "appears to be a juvenile female in the shower"; Exhibit 36 depicts "a juvenile female looking at a man's penis"; Exhibit 37 "appears to be a juvenile female

bending over showing her buttocks"; Exhibit 38 "appears to be a juvenile touching a man's penis and possibly holding a ruler"; Exhibit 39 is a "graphic from the phone showing a man's penis and a possible juvenile standing near it"; Exhibit 40 is a "graphic of a man's penis recovered from the phone"; and Exhibit 41 is "a picture [of] a possible juvenile standing with a notebook or papers; similar situation as the other pictures."  Scott testified that in Exhibit 41, "a man's penis is visible near the girl or the child."

**{¶ 25}** Scott then identified graphic images that had been deleted from the phone that he was able to recover as follows:  Exhibit 43 "appears to be a juvenile female.  You can see her face and she appears to be holding a penis"; Exhibit 44 "appears to be a juvenile female bending over and showing her buttocks"; Exhibit 45 "appears to be a juvenile female performing fellatio"; Exhibit 46 "appears to be a female bending over showing her genitalia"; Exhibit 47 "shows a possible juvenile female showing full frontal nudity"; Exhibit 48 "appears to show a possible juvenile showing nude buttocks"; Exhibit 49 shows "a juvenile female in the shower; full frontal nudity"; Exhibit 50 shows "a man's penis touching the genitalia of a female"; Exhibit 51 shows "a possible minor's nude buttocks"; Exhibit 52 depicts a "juvenile female looking at a man's penis"; Exhibit 53 shows, "again, a juvenile female * * * looking at a man's penis."  Scott stated that Exhibit 52 was the original photograph and Exhibit 53 is a thumbnail version thereof.  Scott testified that he was able to extract metadata from one image, namely State's Exhibit 54, which is another version of State's Exhibit 52, which reflected that the picture was taken on May 29, 2014 at 9:48 p.m. from Appellant's phone.

**{¶ 26}** On cross-examination, Scott testified that he has no independent knowledge regarding who placed the above images on Appellant's phone or who had

access to the phone. In response to a question from the court, Scott indicated that in the absence of active wire service to the phone, it would still be capable of taking photographs.

{¶ 27} V.W. next testified that she resides in Dayton with her mother, her daughter N.W., who was born in 2005, and W. She testified that she resided at Appellant's home on Hook Road in Xenia from October 2013 until June of 2015, with W., N.W. and Appellant. V.W. stated that Appellant left the residence after W. turned in the evidence against him to the police. She stated that before that time, she, W., and N.W. shared one of two bedrooms upstairs in the home, and that Appellant stayed in the other bedroom. She stated that N.W. was often alone with Appellant in the home while she went grocery shopping and ran other errands. V.W. stated that she met with Detective Kyle Metz on April 22, 2015 regarding the identification of individuals in photographs.

{¶ 28} V.W. testified that she was shown Exhibit 36 with the penis "marked over" and that she identified N.W. in the photograph. V.W. identified N.W.'s shirt in Exhibit 28, and she stated that the shirt depicts "Esmeralda, off the Hunchback of Notre Dame." V.W. also identified N.W.'s shirt in Exhibits 29 and 31. V.W identified N.W.'s "hair, her butt" in Exhibit 32. She stated that she recognized N.W. "without a doubt." V.W. identified N.W.'s face in Exhibit 33. In Exhibit 34, V.W. identified N.W.'s "arm and her shirt." She stated that the shirt is the same one she previously identified. In Exhibit 35, V.W. identified N.W., as well as the curtain in the upstairs bathroom on Hook Road where she resided. V.W. identified "the back of [N.W.] and her butt" in Exhibit 37, as well as N.W.'s same shirt in Exhibit 38. In Exhibit 39, V.W. identified N.W.'s multi-colored leopard print "shorts and her shirt." She identified "[N.W.], shorts and shirt" in Exhibit 41.

{¶ 29} V.W. further identified N.W.'s face and "her Peace shirt" in Exhibit 43. In Exhibit 44, V.W. identified N.W.'s "shirt and her bottom." V.W. identified N.W.'s face and the Esmeralda shirt in Exhibit 45. In Exhibit 47, V.W. testified that she recognized N.W., and she stated that she appears to have a temporary tattoo on her stomach. She stated that the photograph was taken in the living room on Hook Road. V.W. identified Exhibit 48 as "the back of [N.W.]." V.W. identified N.W. in Exhibit 49, and she stated that the photo was taken in the bathroom on Hook Road. She identified Exhibit 51 as "the back of [N.W.]," and Exhibit 52 as "[N.W.] in her shirt."

{¶ 30} V.W. stated that she was not aware of the photographs before meeting with Metz and that she did not give her permission for the photographs to be taken. V.W. testified that she took N.W. to Michael's House Advocacy Center. V.W. testified that W.'s penis is not circumcised, and the penis visible in the photographs is circumcised. V.W. stated that in May of 2014, N.W. was eight years old. On cross-examination, V.W. testified that W. and Appellant had an argument about the business, and that they did not like each other.

{¶ 31} N.W. testified that she is 10 years old and in the fifth grade. She testified that she used to reside in Appellant's home on Hook Road in Xenia when she was in second and third grade. N.W. stated that she was left alone with Appellant when "my mom and [W.] would go out somewhere to go get groceries or something." She stated that Appellant took pictures of her the "first and second time." She identified Exhibit 43 as a photograph of Appellant's "privacy," and she testified that she is "[h]olding his privacy" in the image. N.W. stated that Appellant's "privacy" is also called a penis. When asked what she was doing with Appellant's penis in Exhibit 43, she responded, "I

had to grab it and rub it. And hold it." N.W. identified Exhibit 45 as "[m]y mouth sucking his privacy." N.W. stated that she did so "[b]ecause he threatened me to."

{¶ 32} N.W. stated that Exhibit 49 depicts her taking a shower in the Hook Road bathroom, and that Appellant took the picture. When asked how Appellant threatened her, N.W. responded that Appellant "said he would lock me up in the closet and break my arm." N.W. testified that Appellant put his penis in her mouth one time, and that she touched his penis one time. She stated that the offenses occurred on different days.

{¶ 33} Detective Kyle Metz testified he investigates "mostly felonies, some misdemeanors and I also assist in the Property Room management when the Property Manager is out." He stated that he was assigned to investigate Michael Lancaster. Metz testified that he met with N.W. at her elementary school along with "a victim advocate named Becky Walsh, the principal, * * *, and the Children's Services worker," Christy Weber. Metz stated that he was not aware of the contents of the cell phone at the time, and that "the meeting was to ask general questions about their safety and if they had any concerns about their living conditions and anyone living in the home." Metz stated that at the conclusion of the meeting, he felt that N.W. was safe in her home.

{¶ 34} Metz stated that he "authored a search warrant and presented it to the municipal court judge here at the Xenia Municipal Court requesting that the cell phone and the camera be evaluated by a Forensic Analyst of our choice – that being BCI in London and it was authorized." After viewing Scott's report, Metz testified that in the images he "could tell it was a child but I could not positively identify that child at that time." Metz testified that V.W. "came into the Sheriff's Office at my request and met with myself and a victim advocate in our conference room." Metz stated that he showed V.W. a

photograph and she identified N.W. therein. He stated that he covered the male genitalia depicted in the photograph with a post-it note. After V.W. identified N.W., Metz stated that he advised her he wanted to have a forensic interview of N.W. at Michael's House. Metz stated that N.W. made a disclosure in the course of the forensic interview. On cross-examination, Metz stated that in the course of the initial interview at N.W.'s school that she indicated to him that there were no problems at home. On re-direct examination, Metz testified that N.W. told him at her school that she felt safe because Appellant no longer resided at the Hook Road address.

**{¶ 35}** At the conclusion of the State's case, counsel for Appellant moved "for a motion to dismiss and or a directed verdict," and the court overruled the motions. Counsel for Appellant then made his deferred opening statement.

**{¶ 36}** Michael Lancaster testified that his date of birth is June 18, 1951 and that he is 65 years old. When asked if he was depicted in any of the photos discussed above, he responded, "Absolutely, unequivocally, no." Appellant stated that he and W. re-established a relationship in 2013 after he had a "massive cardiac event resulting in a quintuple bypass in 2012." Appellant testified that in 2002, he "purchased from Fred Easton that business known as Buck Stove and Fireplace because I did installations for him for several years." Appellant stated that he was married and had one biological child in 1974, a daughter. He stated that he and his wife "adopted a sibling group of four children," including W.

**{¶ 37}** Appellant stated that his relationship with W. was "rocky," and "now he's forty-something and still being arrested for felony events." Appellant stated that he had not spoken to W. for 15 years before his bypass surgery. Appellant stated that he

resided at the Hook Road address at the time of his surgery, and that the house was titled in his biological daughter's name. Appellant stated that when W. began helping him, he "became my right hand man out in the field and almost with a month or two we started talking about him eventually working his way into running the business," around February or March of 2014.

{¶ 38} Appellant testified that W. suggested that he take a vacation to visit his two adopted daughters in North Carolina and then go on to Florida. According to Appellant, after two days in North Carolina, he returned home because the "idea of going to Florida and spending a week or two was an anathema to me." Appellant testified that he went straight to his business and noted that the business truck was gone and there "was a younger woman, late twenties, thirties, or so; and an older woman forty-five or fifty or so in my office. One was sitting in front of my computer and one was sitting behind my desk." Appellant testified that he did not know the women.

{¶ 39} Appellant stated that after trying to locate W.'s job site on the computer, he went to the bank and noticed that his bank balance was zero. According to Appellant, he had a balance of $22,000.00 before he left for North Carolina. Appellant testified that he had made W. a signatory on the account. According to Appellant, W. "had opened up a business Buck Stove and Fireplace, LLC, filed papers I didn't know anything about." Appellant testified that W. "transferred every dime out of my bank account into the new business and I was not a signatory on that account." Appellant stated that he fired W. Appellant stated that before the above dispute occurred, in April of 2014, the title to the Hook Road property had been transferred to W. because he and Appellant intended to add an addition to the home and relocate the business there.

{¶ 40} Regarding Exhibit 1, Appellant testified that he does not "know about that phone because I haven't seen it close up." When shown Exhibit 1, Appellant stated that it "looks like a phone that was in the nightstand next to my bed that had been there for a year or more." Appellant testified that he had replaced the phone, and that the last time he used it was "[e]asily a year before." Appellant testified that anyone in the home could have access to the phone, and that N.W. "played with it all the time." When asked to identify the people depicted in the photos on the phone, Appellant responded, "[t]he little girl appeared to be [N.W.] The male in the pictures I do not have a clue."

{¶ 41} On cross-examination, Appellant acknowledged that he lived with N.W. in May of 2014, and that there were times when he was alone with her. He further acknowledged that he told Detective Moore that he looked at adult pornography on his phone, and that there had been a prior allegation against him with regard to child molestation. Appellant acknowledged that W.'s financial situation improved significantly once he began to work with Appellant and was able to reside in the Hook Road home. According to Appellant, prior to November 13, 2014, things were going in a positive direction with the business.

{¶ 42} After the defense rested, the State requested permission to reopen its case for the purpose of establishing venue. The court indicated as follows: "The Court's view is that venue was clearly established and I want a reviewing body to know that the Court believed venue was established when it ruled on the defense's Rule 29 that the defense made." Defense counsel responded that "the venue was addressed preliminarily and at the Rule 29 Motion, so we would strenuously object to State's case being reopened." In response to a question from the court, defense counsel indicated that he believed that

venue was properly established. The court granted the State's motion.

{¶ 43} N.W. was again called to testify. She stated that she put her mouth on Appellant's penis in his bedroom at the home on Hook Road in Greene County. She stated that she put her hand on his penis in the same bedroom. She stated that Appellant also took pictures of her at the same residence. Detective Metz also testified that the Hook Road address is in Greene County. In instructing the jury prior to deliberations, the court advised the jurors that Count 2, the second rape count, had been dismissed by the State.

{¶ 44} We note that on August 21, 2017, this court issued a Decision and Entry which provides that on August 2, 2017, the State received notification from the Ohio Department of Rehabilitation and Correction that Appellant is deceased. This Court granted the State's subsequent "motion to substitute appellant's counsel, Thomas Kollin, as the party/representative in this appeal."

{¶ 45} Appellant asserts six assignments of error herein. His first assigned error is as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS.

{¶ 46} Appellant asserts that the State violated his "rights when they failed to provide him with *Miranda* warnings during custodial interrogation." According to Appellant, "the State conceded that Appellant was interrogated, and thus the only issue is whether he was in custody. * * * Although the Appellant came to the sheriff's office on his own accord, the interview was at the sheriff's office with the door closed." Appellant asserts that Moore "was not in uniform, but he was wearing his service weapon, which

would reasonably have a coercive effect." Appellant asserts that even if he were not in custody initially, "the interaction turned into custodial interrogation after the deputy left and spoke with [W.]" Appellant argues that when Moore returned to the interview room, "his questions were more specific as to the allegations and more direct as to whether Appellant had taken pictures of the juvenile." Under "the circumstances surrounding the interrogation, a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave."

{¶ 47} As this Court has previously noted:

Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact. *State v. Long,* 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). When ruling on a motion to suppress evidence, a trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. *State v. Treesh,* 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001). Accordingly, reviewing courts must defer to the trial court's findings of fact if competent, credible evidence exists to support the findings. *State v. Dunlap,* 73 Ohio St.3d 308, 314, 652 N.E.2d 988 (1995). A reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Long* at 332, 713 N.E.2d 1.

The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass,* 10

Ohio St.2d 230, 227 N.E.2d 212 (1967). In *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), we observed: "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."
*State v. Reed*, 2016-Ohio-7416, 72 N.E.3d 1196, ¶ 21-22 (2d Dist.).

**{¶ 48}** As this Court has further noted:

Interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Fair,* 2d Dist. Montgomery No. 24120, 2011-Ohio-3330, ¶ 40, citing *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.) and *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). * * * Statements made on the subject's own initiative, in the absence of questions or other conduct by police, do not constitute "interrogation." *State v. Johnson,* 2d Dist. Montgomery No. 20624, 2005-Ohio-1367, ¶ 25, citing *City of Akron v. Milewski,* 21 Ohio App.3d 140, 487 N.E.2d 582 (9th Dist.1985).

*State v. Moody*, 2012-Ohio-3390, 974 N.E.2d 1273, ¶ 16 (2d Dist.).

**{¶ 49}** As this Court has further noted:

"Police are not required to administer *Miranda* warnings to everyone whom they question." *State v. Biros,* 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Warnings need not be given "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon* at 495. "Only custodial interrogation triggers the need for *Miranda* warnings." *Biros* at 440, citing *Oregon* at 494. A person is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

*State v. Hill*, 2d Dist. Clark No. 2013-CA-108, 2015-Ohio-897, ¶ 10.

**{¶ 50}** We conclude that the trial court's determination that Moore's discussion with Appellant was not a custodial interrogation is supported by competent, credible evidence. Hill testified that Appellant came to the dispatch center voluntarily. Appellant indicated to Hill that he was willing to speak to a detective, and that Hill did not coerce him into doing so. Moore testified that Appellant "wanted to give his version of events." Moore stated that Appellant was not handcuffed or arrested, and that he entered the interview room voluntarily. While Moore testified that he was wearing his service weapon, there is no evidence that he brandished the weapon or used it to intimidate Appellant, and we have no reason to conclude that its mere presence on Moore's person "would reasonably

have a coercive effect." Moore stated that he made Appellant aware that the door to the interview room was not locked and that the door was shut for purposes of privacy. Moore showed Appellant the exit door and "made sure that he knew he could use that exit in that hallway to leave." Moore stated that he advised Appellant that he could terminate the interview at any time. Moore testified that his tone was casual, and that he did not threaten or intimidate Appellant, and that Appellant did not demonstrate any inability to understand his questions. Moore noted that at no time did Appellant ask for a lawyer or indicate that he no longer wanted to speak to Moore. According to Moore, Appellant "was never in custody" and that after he "stated everything that he wanted to tell, he left." The trial court clearly credited Moore's testimony, and we defer to the trial court's assessment of credibility. For the foregoing reasons, we conclude that the trial court did not err in overruling Appellant's motion to suppress, since he was not in custody and accordingly not entitled to *Miranda* warnings. Appellant's first assignment of error is overruled.

{¶ 51} Appellant's second assigned error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE STATE TO REOPEN ITS CASE IN CHIEF BECAUSE IT UNDULY PREJUDICED APPELLANT.

{¶ 52} Appellant argues that the "judgment of the Trial Court must be reversed because its decision to allow the State to reopen its case-in-chief, over Appellant's objection, amounted to prejudicial error." Appellant asserts that he "conceded that venue was established. * * * Nevertheless, over Appellant's objection, the Trial Court allowed the State to reopen its case-in-chief, which resulted in the complaining witness testifying

again." Appellant argues that his "Rule 29 had been overruled, and venue had been established. By allowing the State to reopen its case, the Trial Court essentially allowed the State to arbitrarily call upon the complaining witness a second time and improperly play on the emotions of the jury."

**{¶ 53}** As this Court has previously noted:

R.C. 2945.10, titled "Order of proceedings of trial" provides in relevant part as follows: "(C) The state must first produce its evidence and the defendant shall then produce [the defendant's] evidence." "(D) The state will then be confined to rebutting evidence, *but the Court, for good reason, in furtherance of justice, may permit evidence to be offered by either side out of its order.*" (Emphasis added.) The general rule is that the question of opening up a case for the presentation of additional evidence is within the sound discretion of the trial court, and the court's action will not be disturbed on appeal unless it appears that the court abused its discretion. *Columbus v. Grant* (1981), 1 Ohio App.3d 96.

*State v. Swopes*, 2d Dist. Montgomery No. 9081, 1986 WL 1053, *3 (Jan. 27, 1986).

**{¶ 54}** As this Court has noted:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 553 N.E.2d 597 (1990). *Feldmiller v.*

*Feldmiller*, 2d Dist. Montgomery No. 24989, 2012–Ohio–4621, ¶ 7.

*Johnson v. Ulmer,* 2d Dist. Greene No. 2013 CA 9, 2013–Ohio–4240, ¶ 21.

**{¶ 55}** We conclude that Appellant's second assignment of error lacks merit. Appellant has not established prejudice upon the reopening of the State's case-in-chief. Initially, we note that Appellant's Crim.R. 29 motion was not addressed to venue, hence his objection to the reopening on that basis must fail. "In *State v. Schuyler*, 2d Dist. Clark No. 11 CA 46, 2012-Ohio-2801 * * * [this Court] held that the defendant's Crim.R. 29 motion asserting that the State failed to prove each element of the offenses was 'too general to put the prosecutor and the court on notice of the venue issues.' *Id.* at ¶ 17." *State v. Short*, 2d Dist. Montgomery No. 27192, 2017-Ohio-7200, ¶ 25. This Court further "noted that venue is not a material element of any offense charged and that the venue and the elements of an offense are separate and distinct matters. *Id.*, citing *State v. Draggo*, 65 Ohio St.2d 88, 90, 418 N.E.2d 1342 (1981)." *Short*, *id.*

**{¶ 56}** " 'Venue relates to the right of a criminal defendant to be tried in the county in which the alleged offense occurred.' *State v. Harris*, 6th Dist. Fulton No. F-04-005, 2005-Ohio-1779, ¶18; *see also* Ohio Constitution, Article I, Section 10; R.C. 2901.12." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 32. " 'If the state fails to produce evidence of proper venue, then the evidence is insufficient to sustain a conviction of such offense or offenses.' *State v. Hampton,* 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 22." *Adams*, *id.* " ' "[I] it is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the indictment." ' " *Adams*, *id.*, quoting *Hampton*, ¶

19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. Given Appellant's concession that venue was established, the preferred course may have been a stipulation on venue. Nevertheless, N.W. had testified the Hook Rd. address was in Xenia but there was a lack of testimony regarding Greene County. Thus, the trial court did not err by allowing limited testimony regarding the county and state. Since an abuse of discretion is not demonstrated in the trial court's decision allowing the State to briefly reopen its case to confirm venue, Appellant's second assignment of error is overruled.

{¶ 57} Appellant's third assignment of error is as follows:

THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 58} Appellant asserts as follows:

In the case at hand, trial counsel for Appellant failed to call any expert witnesses, failed to conduct effective cross-examination, and deferred his opening statement. * * * Additionally, trial counsel failed to request a competency hearing before allowing the complaining witness to testify, who was ten years old at the time of trial but 8 years old when the alleged events occurred.

{¶ 59} As this Court has previously noted:

To establish a claim for ineffective assistance of counsel, the defendant has the burden of demonstrating that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) there is a reasonable probability that the result of the defendant's trial or legal

proceeding would have been different had defense counsel provided proper representation. *State v. LeGrant,* 2d Dist. Miami No. 2013–CA–44, 2014–Ohio–5803, ¶ 26, citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness, and that counsel's deficiencies were serious enough to create a reasonable probability that, but for the deficiencies, the result of the trial would have been different.

*State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 7.

**{¶ 60}** Regarding Appellant's assertion that defense counsel was ineffective in failing to call any expert witnesses, he does not specify what type of expert witness should have been called, or how any expert testimony would have altered the outcome of the trial.  This argument accordingly fails.  While Appellant argues that defense counsel's cross-examination was ineffective, Appellant does not direct our attention to any place in the record in support of his assertion.  App.R. 16(A)(3) provides that an appellant's brief include: "A statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected." Appellant's unsupported assertion accordingly fails. Regarding defense counsel's deferred opening statement, opening statements are not evidence upon which a jury may rely, the jury herein was so instructed, and we have no basis to conclude that the outcome of the trial court would have been otherwise if defense counsel provided an opening statement at the start of trial.    Finally, Evid.R. 601 provides that "Every person is competent to be a witness except: (A) * * *

children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." N.W. testified that she was ten years old at trial, and pursuant to Evid. R. 601(A), she was competent to testify. Further, her competence is demonstrated by her testimony; she clearly understood the questions she was asked and provided appropriate responses. In other words, we have no basis to conclude that defense counsel's performance was deficient for failing to request a competency hearing for N.W.

{¶ 61} For the foregoing reasons, we conclude that Appellant has failed to establish that but for the above alleged deficiencies, the outcome of the trial would have been different. Appellant's third assignment of error is overruled.

{¶ 62} Appellant's fourth assignment of error is as follows:

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN IT OVERRULED ITS MOTION TO DISMISS PURSUANT TO CRIM.R. 29.

{¶ 63} According to Appellant, "the State did not prove each element beyond a reasonable doubt. The State's case was largely based on testimony and pictures from the cell phone where the perpetrator is never shown. Therefore, Appellant's Motion for Judgment of Acquittal was improperly denied." Although the State does not raise this issue, we note that defense counsel failed to renew his Crim.R. 29 motion for acquittal at the close of all the evidence at trial. " 'An accused waives his or her right to a directed verdict of acquittal at the close of the state's case by thereafter introducing evidence and then failing to renew the motion at the close of all the evidence.' (Citation omitted.) *State v. Butler,* 10th Dist. Franklin No. 98AP–55, 1998 WL 733762, *4 (Oct. 22, 1998),

citing *Dayton v. Rogers,* 60 Ohio St.2d 162, 163, 398 N.E.2d 781 (1979). [*Rogers overruled on other grounds, State v. Lazzaro,* 76 Ohio St.3d 261, 667 N.E.2d 684 (1996).]" *State v. Welch*, 2d Dist. Montgomery No. 25921, 2014-Ohio-3349, ¶ 9. The right to challenge the trial court's decision on Appellant's motion for acquittal was waived by defense counsel. As in *Welch*, the trial court's decision is subject to reversal only if the trial court's action rises to the level of plain error. *Welch*, *id*., citing *State v. Engle,* 2d Dist. Montgomery No. 15293, 1997 WL 205994, *2 (April 25, 1997). As this Court further noted in *Welch*, " '[i]n order to find plain error, this court must be convinced that, but for the error the outcome of the proceeding would clearly have been different.' (Citation omitted.) *Id.*" N.W. testified that Appellant committed the offenses against her, the jury clearly credited her testimony over his, and we have no basis to conclude that the outcome of the trial would have been different if defense counsel renewed his motion for acquittal. Accordingly, Appellant's fourth assignment of error is overruled.

**{¶ 64}** Appellant's fifth assignment of error is as follows:

THE JUDGMENTS OF CONVICTION ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW.

**{¶ 65}** Appellant asserts as follows:

In the case at hand, the State produced photos where the perpetrator was never shown. * * * Moreover, the State's main witnesses were not credible. They produced the complaining witness who was 8 years old at the time the alleged events occurred, and 10 years old at the time of trial. Additionally, [W.,] one of the State's primary witnesses, revealed that he

had been to prison and has multiple felony convictions for crimes such as burglary, possession of criminal tools, vandalism, and theft. Therefore, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 66} As this Court has previously noted:

The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When presented with a challenge to the manifest weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

In *State v. Vencill*, 10th Dist. Franklin No. 11AP–1050, 2012–Ohio–4419, the Tenth District Court of Appeals observed that:

In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge,* 10th

Dist. No. 10AP–105, 2010–Ohio–4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.,* quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the trier of fact's determination of witness credibility. (Citations omitted).

*Vencill,* at ¶ 11.

*State v. Stevenson*, 2d Dist. Montgomery No. 26583, 2016-Ohio-321, ¶ 8-9.

**{¶ 67}** R.C. 2907.02 proscribes rape and provides: "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * (b) the other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" includes fellatio. R.C. 2907.01(A). R.C. 2907.05 proscribes gross sexual imposition and provides: "(A) No person shall * * * cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * (4) The other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." "Sexual contact" means "any touching of an erogenous zone of another, including the * * * genitals * * *." R.C. 2907.01(B). Finally, R.C. 2907.323 proscribes illegal use of a minor in nudity-oriented material or performance and provides:

(A) No person shall do any of the following:

(1) Photograph any minor who is not the person's child or ward in a

state of nudity, or create, direct, produce, or transfer any material or performance that shows the minor in a state of nudity, unless both of the following apply:

(a) The material or performance is, or is to be, sold, disseminated, displayed, possessed, controlled, brought or caused to be brought into this state, or presented for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, member of the clergy, prosecutor, judge, or other person having a proper interest in the material or performance;

(b) The minor's parents, guardian, or custodian consents in writing to the photographing of the minor, to the use of the minor in the material or performance, or to the transfer of the material and to the specific manner in which the material or performance is to be used.

**{¶ 68}** Regarding Appellant's rape conviction, V.W. identified N.W.'s face and Esmeralda shirt in Exhibit 45, and N.W. testified that Exhibit 45 depicts "[m]y mouth sucking [Appellant's] privacy," or penis. Regarding Appellant's conviction for gross sexual imposition, V.W. identified N.W.'s face and "her Peace shirt" in Exhibit 43, and N.W. testified that Exhibit 43 depicts her "[h]olding [Appellant's] privacy" or penis. N.W. stated that she "had to grab it and rub it. And hold it." Regarding Appellant's illegal use of a minor in nudity-oriented material, Scott testified that Exhibit 32 depicts a juvenile from the rear "showing her buttocks," and V.W. identified N.W.'s "hair, her butt" therein. Scott

testified that Exhibit 37 depicts "a juvenile female bending over showing her buttocks," and V.W. identified "the back of [N.W.] and her butt" therein. Scott testified that Exhibit 47 depicts "a possible juvenile female showing full frontal nudity," and V.W. identified N.W. therein and testified that photo was taken in the living room of the Hook Road home. Scott testified that Exhibit 49 depicts "a juvenile in the shower, full frontal nudity," and N.W. testified that she is depicted in the image and that Appellant took the picture.

**{¶ 69}** Having thoroughly reviewed the entire record, we have no basis to conclude that the jury lost its way such that a manifest injustice resulted. In other words, Appellant's convictions for rape, gross sexual imposition, and illegal use of a minor in nudity-oriented material are not against the manifest weight of the evidence. Appellant's fifth assigned error is accordingly overruled.

**{¶ 70}** Appellant's sixth and final assigned error is as follows:

THE TRIAL COURT IMPOSED A SENTENCE THAT WAS CONTRARY TO LAW BECAUSE IT IMPOSED CONSECUTIVE SENTENCES FOR ALLIED OFFENSES OF SIMILAR IMPORT.

**{¶ 71}** Appellant asserts as follows:

In the case at bar, Appellant was convicted of both rape and gross sexual imposition. * * * "Sexual conduct" necessarily includes "sexual contact." Thus, having sexual conduct with a person under 13 years of age necessarily requires having sexual contact. Finally, these convictions arise from the same conduct. Therefore, Appellant's convictions of rape and gross sexual imposition are allied offenses of similar import and accordingly the sentence must be reversed.

**{¶ 72}** As this Court has previously noted:

R.C. 2941.25 provides:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

A defendant's failure to object to convictions or sentencing at trial results in a waiver of an allied offense claim on appeal absent plain error. *State v. Comen* (1990), 50 Ohio St.3d 206, 211, 553 N.E.2d 640; *State v. Brown* (1993), 90 Ohio App.3d 674, 630 N.E.2d 397; *State v. Hipple* (May 21, 1999), Miami App. No. 98CA49; *State v. Burch* (Sept. 29,1995), Montgomery App. No. 14488. An appellate court has discretion to notice plain error. *State v. Wickline* (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would have been different. *State v. Long* (1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804.

*State v. Denham,* 2d Dist. Greene No. 2001 CA 105, 2002-Ohio-3912, ¶ 7-10.

{¶ 73} The Ohio Supreme Court explained the analysis for determining whether multiple crimes constitute allied offenses of similar import as folllows:

When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25(B).

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a

defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 24-26.

**{¶ 74}** We conclude that plain error is not demonstrated since Appellant's rape offense and gross sexual imposition offense are not allied offenses of similar import. N.W. testified that the rape and gross sexual imposition offenses were committed separately, on different days. Accordingly, Appellant was properly sentenced consecutively. Appellant's sixth assignment of error is overruled.

**{¶ 75}** Having overruled Appellant's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Nathaniel R. Luken
Thomas M. Kollin
Hon. Michael A. Buckwalter