**[Cite as *State v. Letts*, 2020-Ohio-6643.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-77 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-514 |
| | : | |
| ERIC H. LETTS, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of December, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

WILLIAM O. CASS, JR., Atty. Reg. No. 0034517, 135 West Dorothy Lane, Suite 117, Dayton, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Eric H. Letts, Jr., appeals from his conviction for possession of a fentanyl-related compound, a second degree felony under R.C. 2925.11(C)(11)(d). In support of his appeal, Letts contends that the trial court erred in overruling his motion to suppress because the duration of the traffic stop exceeded the time needed to issue a citation, and the State failed to prove that a reasonable, articulable suspicion existed to extend the stop. In addition, Letts contends that the six-year sentence the trial court imposed was clearly and convincingly unsupported by the record.

{¶ 2} For the reasons discussed below, we conclude that the trial court did not err in overruling Letts's motion to suppress. We also are unable to find that the sentence was clearly and convincingly unsupported by the record or contrary to law. The judgment of the trial court, therefore, will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} Letts was originally charged with possession of drugs and illegal use of supplemental nutrition or WIC program benefits in Clark County Common Pleas Court Case No. 2019-CR-194. Both of these charges were fifth-degree felonies. After pleading not guilty, Letts filed a motion to suppress evidence, and the trial court held a hearing on August 16, 2019. Subsequently, the State filed another indictment on August 19, 2019, asserting the same charges; however, the degree of felony for the drug charge was increased from a fifth-degree felony to a second degree felony. The second case was designated as Clark County Common Pleas Court No. 2019-CR-514. The court overruled the motion to suppress in Case No. 2019-CR-194 pursuant to an entry filed on August 22, 2019. The court then consolidated the two cases.

{¶ 4} After Letts again pled not guilty, the trial court set the case for a jury trial to be held on October 15, 2019.   However, on that date, the parties presented the trial court with a written plea agreement.   Under the agreement, Letts pled no contest to possession of a fentanyl-related compound, a second-degree felony, in Case No. 2019-CR-514.   In exchange, the State agreed to dismiss the charges in Case No. 2019-CR-194 and also to dismiss the other charge in Case No. 2019-CR-514.   The trial court accepted the plea, indicated it would order a presentence investigation, and scheduled sentencing for November 5, 2019.   At the disposition hearing, the court sentenced Letts to a six-year mandatory term of imprisonment,   Letts then appealed from the suppression decision in Case No. 2019-CR-194 and from the final judgment in Case No. 2019-CR-514.

## II.   The Suppression Decision

{¶ 5} Letts's First Assignment of Error states that:

> The Duration of the Stop Exceeded the Time Necessary to Issue a Citation Because the Appellee Failed to Prove That There Was a Reasonable Articulable Suspicion [to] Extend the Stop.

{¶ 6} Under this assignment of error, Letts contends that the officer who stopped the vehicle in which Letts was riding unlawfully extended the initial stop,   Letts further argues that testimony that the police officers smelled burnt marijuana did not justify extending the stop because neither officer on the scene testified that he was qualified to recognize the odor of marijuana.   Finally, Letts maintains that his consent to a search was negated by the unlawful detention.

{¶ 7} In overruling the motion to suppress, the trial court found that the stop of the vehicle was proper, because the officer initiating the stop observed a window tint violation. The court further held that even if the reason for the stop may have been pretextual, the officer's subjective motivation did not invalidate an otherwise constitutional stop. In addition, the court found that the duration of the stop was not carefully tailored to its justification and lasted longer than necessary. However, the court also found that the situation was more than routine and required additional time due to the fact that the officer smelled a strong odor of burnt marijuana and due to the number of people in the vehicle. Finally, while the court did not discuss consent in detail, it did note that Letts consented to a search of the vehicle and also to a search of his person.

{¶ 8} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*.

{¶ 9} Both the Fourteenth Amendment to the United States Constitution and Article I, Section 14, Ohio Constitution, protect persons from unreasonable searches and seizures. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 13. "Under the Fourth Amendment to the United States Constitution, a search conducted without prior approval of a judge or magistrate is per se unreasonable, subject to certain

well-established exceptions." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 181, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 567 (1967). (Other citation omitted.)

{¶ 10} One exception occurs in connection with a traffic stop, which "is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. Furthermore, "these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). Courts reviewing officers' actions must also accord "due weight" to their "experience and training and view the evidence as it would be understood by those in law enforcement." *Id.* at 88.

{¶ 11} After reviewing the record, including State's Ex. 1, we conclude that the trial court did not err in overruling Letts's motion to suppress.

{¶ 12} At the suppression hearing, the only witnesses were Detective Justin Masse and Sergeant James Byron, who were officers from the Springfield, Ohio, Police Department. The evidence presented at the hearing was as follows.

{¶ 13} On December 18, 2018, Massie was on the day shift and was patrolling the city for criminal activity. Transcript of Suppression Hearing ("Suppression Tr."), p. 5-6. While on patrol, Massie observed a red Chrysler Sebring automobile coming south on

Clifton Avenue. Massie could see from the vehicle's side that it had tinted windows on the front, but he could not see either the driver or how many passengers were in the automobile. *Id.* at p. 6. After the vehicle turned westbound onto Leffel Lane, it then turned into the U.S.A. Suites, and Massie initiated a traffic stop. *Id.* The basis for the stop was the tinted windows. *Id.*

{¶ 14} Immediately after the stop occurred, the back passenger door opened and a man (later identified as Letts) stepped out. Massie told Letts to "hang on a minute," and Letts then stepped back into the vehicle. *Id.* at p. 7. Massie then approached the driver's side, made contact with the driver, and told him the reason for the stop. At that time, the driver volunteered the information that he did not have a valid driver's license. *Id.*

{¶ 15} As Massie approached the vehicle, he could smell the strong odor of burnt marijuana, and asked the occupants of the vehicle if they still had any raw marijuana. After they said they did not, Massie asked if he could search the vehicle. *Id.* at p. 9-10 and 33-34. All the occupants consented to a search. *Id.* at p. 10. There were three occupants in the vehicle, including the driver. *Id.*

{¶ 16} Massie was alone at the time but could not say the area was a high crime area. *Id.* at p. 10-11. After Massie finished his conversation with the driver, the occupants of the car identified themselves, and Massie went back to his cruiser to do warrant checks. For officer safety, Massie wanted to verify whether any warrants existed, because if someone had a warrant, he or she would likely flee or possibly fight. By the time Massie finished the warrant checks and removed the driver from the vehicle, Detective Byron had arrived on the scene. *Id.* at p. 11-12.

{¶ 17} At that point, Massie asked Letts (who was in the rear passenger seat) to step out of the car. Massie asked Letts if he minded if he patted him down, and Letts said that was fine. *Id.* at p. 12. Letts then began removing a cigarette pack and some other property from his pocket. At this time, Massie told Letts that he would conduct the patdown, and Letts again said that was fine. Normally, there are times Massie will tell people to keep their hands out of their pockets for officer safety. Massie told Letts this, but by that time, Letts had already placed property on the top of the vehicle. *Id.* at p. 12-13.

{¶ 18} While patting Letts down, Massie found brass knuckles and a baggie of marijuana. *Id.* at p. 13-14. During an inventory search of the car, Massie also found a digital scale in the map pocket right behind the front passenger seat. Massie did not remove the scale at that time because there was no residue on it. *Id.* at p. 14. In Massie's experience, scales are commonly used for criminal activity. *Id.* People who purchase drugs use scales to make sure they are not getting ripped off, and dealers use scales to weigh produce. *Id.* at p. 16.

{¶ 19} Massie did not find any other contraband in the vehicle. At that point, he went back to Letts because he had to inventory the brass knuckles and the marijuana. Massie asked Letts for identification so he could do a property receipt. He then asked Letts if anything was in the cigarette pack. Letts consented to a search of the cigarette pack, and Massie saw a cellophane baggie with white powder inside the pack. *Id.* at p. 15.

{¶ 20} After Massie placed Letts in custody, he read *Miranda* rights to Letts. Letts stated that he understood his rights. Massie then asked what the product was and if it

were "cut." Letts responded that it was just cut. *Id.* at p. 16. Between the time Letts was handcuffed and the time he and Massie left the scene, Letts made additional statements. They discussed Letts's comment about the fact that the product was cut, and Massie asked if any product would be in the baggie. Letts said there may be a little bit of product and identified the substance in the bag as fentanyl. *Id.* at p. 18-19.

{¶ 21} Based on his interaction with Letts at the scene, Massie decided to charge Letts with aggravated possession of drugs and illegal use of supplemental nutrition or WIC program benefits. *Id.* at p. 19. During their conversation, Letts had also confessed to having property that was not in his name and talked about how he got and used a supplemental card that he purchased for a certain amount of money. *Id.*

{¶ 22} Massie did not find any burnt marijuana in the vehicle. He described the smell as one that occurs after someone smokes marijuana. *Id.* at p. 22. However, in Massie's training and experience, it is common for him to smell burnt marijuana and find no evidence or marijuana remnants in the vehicle. People do different things after they are finished smoking, like throwing a joint or blunt out of the vehicle to clean out the vehicle. However, the smell remains. *Id.* at p. 33.

{¶ 23} Massie did not know how long the car had been stopped by the time he had filled out his paperwork and gotten the arrest materials put together. *Id.* at p. 23. After that point, he used a light to check the front window tint and found it was less than 10%. The windows immediately to the right and left of the driver were 50% tinted. *Id.* at p. 21. Under Ohio law, the front two windows have to allow 50% light transmission. The tint of the back window or back passenger side windows does not matter. *Id.* The sole reason for the stop was due to the window tint. *Id.* Based on what Massie found, he did not

issue a citation for the window tint.   *Id.* at p. 24.

{¶ 24} Sergeant Byron also testified at the suppression hearing.   When Byron arrived at the scene, Massie was already in the process of removing the occupants from the car, so Byron exited his car and began assisting Massie.   *Id.* at p. 36.   When Byron approached the vehicle, his first impression was that he smelled a considerable amount of burnt marijuana emanating from it.   He was concerned about this because the female in the front seat appeared to be very pregnant, as if she were delivering that day.   *Id.* at p. 39.

{¶ 25} When he smelled the marijuana, Byron was four to five feet away from the vehicle.   *Id.* at p. 40-41.   While he was at the scene, Byron also overheard conversations with both Letts and the female passenger.   According to Byron, both parties consented to the search of the car, and Letts also consented to a search of his person.   *Id.* at p. 37.

{¶ 26} Based on this testimony, we conclude that no illegal detention occurred. Contrary to Letts's assertion, the traffic stop was not unnecessarily long, and Massie did not take one-half hour to measure the window tint.   According to the audio and video on State's Ex. 1, when Massie first arrived on scene, he spent about three minutes talking with the driver and passengers and getting identification.   During this initial encounter, Massie smelled burnt marijuana.   Massie then went back to his cruiser to check if any of the people in the car had outstanding warrants.   This consumed approximately six minutes.[1]   At that point, about nine minutes had elapsed since the stop began.   Massie

---

[1] The video does not contain sound, and the audio is solely from inside the cruiser.   As a result, the times we reference are our best estimates after reviewing the video and audio in State's Ex. 1.   The State contends that 15 minutes elapsed between the stop and Letts's arrest, and that is generally consistent with our estimate, which is that the arrest occurred about 16 minutes after Officer Massie stopped the car.   During the suppression

then spent another couple of minutes talking to the people in the car, and patted down the driver immediately thereafter. At that point, Sergeant Byron had arrived.

{¶ 27} Within about 12 minutes after Massie arrived at the scene, Letts got out of the car, was searched, and marijuana was found in his pocket. The woman passenger was also searched at this time. By the time 16 minutes had elapsed, Massie had found the drugs in the cigarette pack and Letts had been handcuffed. At that point, Massie took Letts back to the cruiser, and then went back a few minutes later to check the window tint.

{¶ 28} Although Massie did not immediately measure the window tint, we must take into account the fact that Massie smelled burnt marijuana when he walked up to the car. The trial court concluded that this "immediately changed the entire nature of the stop." Suppression Decision p. 6. We agree. The court further noted that this, along with the fact that three people were present, the driver's lack of a license, the need to check for warrants, the consent to search the car, and the consent to a search of Letts's person extended the time permitted for the stop. *Id.* Again, we agree.

{¶ 29} "An investigatory *Terry* stop is a limited infringement on personal freedom,

---

hearing, defense counsel claimed the car had been stopped for 30 minutes before Massie checked the window tint. Suppression Tr. at p. 23. However, only around 21 minutes elapsed between when the car was stopped and when Massie checked the tint. In the meantime, Massie checked with dispatch to see if any of the individuals had outstanding warrants, obtained consent for a search, searched the car and all three persons who were in the car, gave Letts *Miranda* warnings, and arrested Letts. In the suppression decision, the trial court also stated that the stop "certainly lasted well over thirty minutes." Suppression Decision, p. 6. This is also incorrect. State's Ex. 1 indicates that Massie returned to the cruiser about 25 minutes after he first arrived. Letts had already been placed in the cruiser. Massie and Letts talked briefly, and then the cruiser left the scene. The rest of the 32-minute video (VID1 on State's Ex. 1) consists of Massie driving Letts to a garage and parking.

and is proper when based on articulable facts constituting reasonable suspicion and the subsequent investigation is pursued diligently in a manner likely to confirm or dispel suspicion quickly." *State v. Cook*, 65 Ohio St.3d 516, 521, 605 N.E.2d 70 (1992). However, "a traffic stop may be prolonged if there is 'reasonable suspicion under the totality of the circumstances [to] justif[y] the ongoing detention.' " *State v. Vega*, 154 Ohio St.3d 569, 2018-Ohio-4002, 116 N.E.3d 1262, ¶ 17, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 22.

{¶ 30} Given the fact that Officer Massie smelled a strong odor of marijuana, he was justified under the circumstances to prolong the detention. The Supreme Court of Ohio has held that "the smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement." *State v. Moore*, 90 Ohio St.3d 47, 48, 734 N.E.2d 804 (2000). Letts acknowledges this point, but contends that neither Massie nor Byron established qualifications for recognizing the odor of marijuana. Appellant's Brief, p. 9.

{¶ 31} After reviewing the record, we find that Massie was adequately qualified to recognize the smell of marijuana. Massie had been employed by the Springfield Police Department for more than five years and had been trained in drug interdiction. Suppression Tr. at p. 5. In addition, Massie testified that in his training and experience, it was common for him to smell burnt marijuana and find no evidence or remnants in the vehicle. *Id.* at p. 32-33. He also commented about other experiences he had had with smelling marijuana in vehicles. *Id.* at p. 34. Testimony that an officer has detected the order of marijuana during other traffic stops allows an inference that the officer is qualified

under *Moore* to recognize marijuana. *State v. Coston*, 168 Ohio App.3d 278, 2006-Ohio-3961, 859 N.E.2d 990, ¶ 19 (10th Dist.), citing *Moore*. Moreover, upon extensive questioning from both sides, Massie described smelling the odor of marijuana throughout his testimony without objection. *Id.* at p. 5, 7, 10, 12, 14, 15, 22, 31, 32, 33, and 34. Therefore, the claimed error was waived.

{¶ 32} Likewise, both sides questioned Sergeant Byron about detecting the odor of marijuana with no objections, so waiver applies to his qualifications as well. *Id.* at p. 39, 41. Sergeant Byron did not directly discuss his prior experience with marijuana, but he did corroborate Massie's detection of a strong odor of marijuana. *Id.* at p. 36, 39 and 40-41. Byron had been a police officer for 22 years and had held many different positions, including uniform patrol, the detective bureau, and investigating crimes against persons. *Id.* at p. 35. Finally, the trial court found that Massie was a "credible witness" and stated that the court had "no reason to doubt the veracity of his testimony." Suppression Decision at p. 5. In addition, the court commented that Byron's testimony corroborated Massie's testimony on several points. *Id.*

{¶ 33} Letts also argues that the trial court improperly took judicial notice that a routine traffic stop takes about 14 minutes in the City of Springfield. Appellant's Brief p. 7. The Court cited two of its prior cases where Officer Nichols testified to this fact. Suppression Decision p. 6. We find this error harmless since the traffic stop here was not routine. Rather, it seamlessly and incrementally developed into a felony drug investigation. The improper finding had no bearing on the result.

{¶ 34} Accordingly, we agree with the trial court that the detention was properly extended and was not illegal. Massie also had probable cause to search the vehicle.

{¶ 35} The remainder of Letts's argument is directed to his contention that the illegal extension of the stop presumptively nullified Letts's consent to the search. Appellant's Brief at p. 10. Letts, therefore, contends that a more stringent standard applies. However, these principles are irrelevant, because the extension of the stop was not illegal. As a result, Letts's consent to the search of his person is evaluated under traditional principles applied to voluntary consent.

{¶ 36} Consent is a recognized exception to the Fourth Amendment's prohibition of warrantless searches. *State v. Shakhmanov*, 2d Dist. Montgomery No. 28066, 2019-Ohio-4705, ¶ 9. " '[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.' " *State v. Robinette*, 80 Ohio St.3d 234, 242-243, 685 N.E.2d 762 (1997), quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

{¶ 37} "To rely on the consent exception of the warrant requirement, the state must show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and *State v. Danby*, 11 Ohio App.3d 38, 41, 463 N.E.2d 47 (6th Dist.1983).

{¶ 38} Ohio courts apply the following factors to decide if consent is voluntary:

" '(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.' " *State v. Forrester*, 2d Dist. Greene No. 97-CA-47, 1998 WL 46653, *4 (Feb. 6, 1998), quoting *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir.1993). (Other citation omitted.)

*State v. Rednour*, 2d Dist. Montgomery No. 25135, 2013-Ohio-2125, ¶ 45.

{¶ 39} The trial court did not specifically discuss these factors, but concluded, after discussing the facts, that the consent to search the automobile and Letts's person was voluntary. Suppression Decision at p. 5. After reviewing the record and applying the factors, we agree.

{¶ 40} As an initial point, Letts's custodial status was not voluntary, as the vehicle in which he was riding had been stopped and the passengers detained until the police either issued a citation or informed the occupants that they were free to go. Nonetheless, there was no evidence of coercive police procedures. In fact, the police even gave Letts a cigarette to smoke after he was handcuffed, before they went downtown. Suppression Tr. at p. 17. In addition, the police noted that Letts was "very cooperative," "cordial," and "pleasant to deal with." *Id.* at p. 17, 28, and 38.

{¶ 41} Letts did not testify at the hearing, and there was no audio available for the traffic stop; as indicated, audio was restricted to the interior of the cruiser. However, the officers were not required to inform Letts that he was allowed to refuse consent to search.

*Robinette*, 80 Ohio St.3d at 243, 685 N.E.2d 762. There was also no evidence in the record regarding Letts's education and intelligence, other than the PSI report, which indicated that Letts graduated from high school. A review of the transcripts of the plea and sentencing hearings indicates that Letts was 25 years of age and employed. Nothing, including Letts's conversation with Office Massie, indicated that Letts lacked intelligence. And finally, there was nothing in the record concerning whether Letts believed incriminating evidence would be found. An inference to that effect could be made, since drugs were found in the cigarette pack that Letts had on his person; in fact, Letts took the pack, along with some other objects, out of his pockets before the search began. Officer Byron testified that he thought the placement of the cigarette pack on the hood of the car was suspicious. Suppression Tr. at p. 37.

**{¶ 42}** Letts's involuntary custodial status and his apparent knowledge that contraband would be found are factors indicating that his consent was involuntary. *Compare State v. Webb*, 2d Dist. Montgomery No. 17676, 2000 WL 84658, *4 (Jan. 28, 2000). However, the remaining factors indicate otherwise, particularly the lack of coercive police procedures and Letts's cooperation.

**{¶ 43}** As an additional matter, the trial court specifically indicated that it found the police officers credible. Suppression Decision at p. 5. We have often stressed that "[w]e defer to the trial court's findings of fact as it is in the best position to assess the credibility of the witnesses." *Webb* at *4. *See also State v. Lancaster*, 2018-Ohio-315, 104 N.E.3d 951, ¶ 50 (2d Dist.); *State v. Smith*, 2d Dist. Montgomery No. 28207, 2019-Ohio-4373, ¶ 31; *State v. Cash*, 2d Dist. Montgomery No. 26535, 2015-Ohio-3792, ¶ 12.

**{¶ 44}** Based on the preceding discussion, the trial court did not err in overruling

Letts's motion to suppress. Accordingly, the First Assignment of Error is overruled.

### III. The Sentence

{¶ 45} Letts's Second Assignment of Error states that:

The Trial Court's Sentence of 6 Years Mandatory Time was Clearly and Convincingly Contrary to Law.

{¶ 46} Under this assignment of error, Letts contends that the trial court erred in sentencing him to a mandatory term of six years in prison. Letts notes that he was age 25, had no prior felony record, was employed, was engaged in substance abuse treatment when he was sentenced, and scored low on the Ohio Risk Assessment.

{¶ 47} The Supreme Court of Ohio has said that "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1. "This is a very deferential standard of review, as the question is not whether the trial court had clear and convincing evidence to support its findings, but rather, whether we clearly and convincingly find that the record fails to support the trial court's findings." *State v. Kennedy*, 2d Dist. Clark No. 2017-CA-100, 2018-Ohio-4997, ¶ 46.

{¶ 48} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 49} "A sentence 'is not contrary to law [if it falls] within the statutory range [and the trial court] expressly state[s] that it * * * considered the purposes and principles of sentencing [under] R.C. 2929.11 [and] 2929.12.' " *State v. Hudson*, 2d Dist. Montgomery No. 28535, 2020-Ohio-4398, ¶ 18, quoting *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069, ¶ 32 (2d Dist.). "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.), citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, at paragraph seven of the syllabus. "Even so, the 'court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C. 2929.12.' " *Hudson* at ¶ 18, quoting *King* at ¶ 45.

{¶ 50} Under R.C. 2929.11(A), courts "shall be guided by the overriding purposes of felony sentencing." According to the statute, these purposes "are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.*

{¶ 51} In addition, R.C. 2929.11(B) states that "[a] sentence imposed for a felony

shall be reasonably calculated to achieve the three overriding purposes of felony sentencing * * * commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 52} Further, "R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense. These factors include whether the physical or mental injury to the victim was exacerbated because of the physical or mental condition of the victim; serious physical, psychological, or economic harm suffered by the victim as a result of the offense; whether the offender's relationship with the victim facilitated the offense; and whether the offender committed the offense for hire or as a part of an organized criminal activity." *State v. O'Connor*, 2d Dist. Montgomery No. 28259, 2020-Ohio-4402, ¶ 36.

{¶ 53} Additionally, "R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense, including whether the victim induced or facilitated the offense, whether the offender acted under strong provocation, whether, in committing the offense, the offender did not cause or expect to cause physical harm to any person or property, and the existence of substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record." *Connor* at ¶ 37.

{¶ 54} At the sentencing hearing, the trial court did not mention R.C. 2929.11 or

R.C. 2929.12, nor did it make any findings. Instead, the court imposed the six-year sentence, told Letts he would be subject to a mandatory three-years of post-release control, instructed Letts of the consequences of violating post-release control, and indicated Letts would receive credit for any time spent in the county jail. Disposition Hearing Transcript (Disposition Tr.), p. 7-8. Despite this omission, we have held that "[a] defendant's sentence is not contrary to law when the trial court expressly states in its sentencing entry that it has considered the principles and purposes of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12, but neglects to mention those statutes at the sentencing hearing." *State v. Anderson*, 2d Dist. Clark No. 2019-CA-80, 2020-Ohio-4083, ¶ 21.

{¶ 55} Consistent with our decision in *Anderson*, the trial court did state in the sentencing entry that:

> The Court considered the PSI, record, oral statements of counsel, the defendant's statement, and the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and then balanced the seriousness and recidivism factors under Ohio Revised Code Section 2929.12.

Judgment Entry of Conviction, p. 1. Thus, the court's failure to mention these items at the sentencing hearing did not cause the sentence to be contrary to law. *See State v. Watson*, 2d Dist. Clark No. 2019-CA-35, 2020-Ohio-1146, ¶ 17.

{¶ 56} Furthermore, based on our review of the record, we are unable to find that the trial court's decision was clearly and convincingly unsupported by the record. Letts pled no contest to possession of a fentanyl-related compound in violation of R.C.

2925.11(C)(11)(d), which was classified as a second-degree felony, with a maximum prison term of eight years. The minimum mandatory term was two years. R.C. 2929.14(A)(2).

{¶ 57} Before R.C. 2925.11(A) was amended in August 2018, possession of fentanyl was a fifth-degree felony. However, for the amount involved in this case (11.77 grams), the crime was thereafter elevated to a second-degree felony. *See* Am.Sub. S.B. 1, 2018 Ohio Laws File 95. The purpose of the amendments was "to increase penalties for drug trafficking violations, drug possession violations, and aggravated funding of drug trafficking when the drug involved in the offense is a fentanyl-related compound." *Id.* The amendments became effective on October 31, 2018.

{¶ 58} The State originally charged Letts with fifth-degree felony possession of drugs in Case No. 2019-CR-194, which was filed in August 2019. If prison is imposed for a fifth-degree felony, the potential prison term is between six and twelve months. R.C. 2929.14(A)(5). However, the State issued a new indictment for Case No. 2019-CR-514, changing the alleged crime to a second-degree felony with a possible mandatory sentence of two to eight years.

{¶ 59} During the sentencing hearing, the defense pointed out the factors mentioned above, including that Letts's prior criminal history contained only what appeared to be a misdemeanor paraphernalia possession in Utah, for which a warrant was pending. Disposition Tr. at p. 4. In addition, the defense noted that substance abuse started early in Letts's life, and that Letts was attending a program at Mercy Reach. *Id.* Moreover, defense counsel commented that Ohio does not do qualitative testing and that "while * * * the substance came in at a weight over the bulk amount to make it the F2

[second-degree felony] and tested positive that it does contain some amount of Fentanyl, there is no qualitative evidence as to what that would be. It could be completely 100% fentanyl or it could be less than 1%. *Id.* at p. 5. Accordingly, the defense asked the court for a minimum two-year sentence.

**{¶ 60}** During the hearing, however, the State stressed the extreme danger that fentanyl poses to the community, stating as follows:

> MR. THOMPSON: Briefly, Your Honor. Perhaps nobody is more acutely aware than this Court of the impact that Fentanyl has had on our community.
>
> Mr. Thomas mentioned, and he's correct, there is no quantitative analysis of the Fentanyl; but the legislature is aware of that and chose to make this a felony of the second degree because of the volume.
>
> And you know, there are several factors – including the fact that this defendant has a prior record, but his indication that he is personally using Fentanyl in the amounts and in the volume that we see here is unlikely.
>
> It's very possible that he was selling that in our community, and the State would ask the Court to impose a significant amount of time in this case.

Dispositional Tr. at p. 7.

**{¶ 61}** Because the trial court deals with criminal defendants every day, it would be in a position to recognize the dangers the drug poses to the community. As the State indicated, the legislature has recognized this danger by acting to heighten the penalty for possessing the drug, even though it may be contained in a compound.

{¶ 62} Even though Letts lacked prior convictions, we have said that a defendant's status as a first-time offender is not a proper basis on which to compare sentences imposed in other cases. *O'Connor*, 2d Dist. Montgomery No. 28259, 2020-Ohio-4402, at ¶ 41. " 'Many factors enter into a sentencing determination in each case, and sentences cannot reasonably be compared to one another in this manner.' " *Id.*, quoting *Armstrong*, 2d Dist. Champaign No. 2015-CA-31, 2016-Ohio-5263, at ¶ 42.

{¶ 63} Furthermore, even though Letts did not have a prior conviction, he apparently fled Utah while a charge was pending, indicating that he has a risk of recidivism. In addition, the fact that a digital scale was found in the map pocket in front of the seat where Letts sat indicates that Letts may have been involved in selling drugs to the community.

{¶ 64} As indicated, our review of the trial court's decision is very deferential. For the reasons stated, we are unable to find that the trial court's sentence was clearly and convincingly unsupported by the record. The Second Assignment of Error, therefore, is overruled.

## IV. Conclusion

{¶ 65} Both of Letts's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. concurs.

FROELICH, J., concurs in part and dissents in part:

{¶ 66} I concur in the majority's affirmance of the denial of the motion to suppress and the judgment of conviction, but I dissent as to the sentence.

{¶ 67} When arrested in this case at age 25, he had an admitted history of drug use going back years which includes alcohol (age 6), marijuana (age 11), cocaine, benzodiazepines, and heroin. He was employed at the time of sentencing. Letts's only *possible* prior criminal history was a misdemeanor *charge* from another state four years earlier.

{¶ 68} Even though a court "has full discretion to impose any sentence within the statutory range," that does not mean a court cannot abuse such discretion or that the sentence within that range cannot be "clearly and convincingly unsupported by the record," which is what I find happened in this case. Otherwise, a trial court's sentence within the statutory range is not subject to appellate review.

{¶ 69} This observation does not diminish the harm and dangers fentanyl presents to individuals and communities; those are no doubt precisely the reasons the legislature made it illegal, let alone provided a recently-increased *mandatory* sentencing range.

{¶ 70} I would sustain the conviction and remand for resentencing.

Copies sent to:

John M. Lintz
William O. Cass, Jr.
Hon. Douglas M. Rastatter